WhitakeR, Judge,
delivered tbe opinion of tbe court:
The plaintiff sues to recover just compensation for the requisitioning for title by the defendant of its vessels- Ne-braslcan, Dakotan, Iowan, Nevadan, Pennsylvanian, Kentuckian, Illinoian, Columbian, Mexican and Virginian. The ten suits were consolidated for trial. The Pennsylvanian, Illinoian, and the Kentuckian petitions include a cause of action for just compensation for the use of the vessels before their requisition for title. The causes of action for use of these three vessels are being tried separately and are not involved in this decision.
Between December 2, 1942, and May 23, 1946, the War Shipping Administration, acting pursuant to section 902 (a) of the Merchant Marine Act of 1936, 49 Stat. 2015, as amended, 46 U. S. C. sec. 1242, requisitioned for title the above named vessels on the dates set forth below:

The plaintiff was tendered as just compensation, exclusive of certain deductions for repairs which we have found were unjustified, the following sums:

*250

On April 11,1945, the War Shipping Administration paid plaintiff 75 percent of the principal amounts of the tenders for seven of the vessels as follows:

On January 18,1949, the Maritime Commission paid plaintiff 75 percent of the principal amounts of the tenders of just compensation for.the remaining three vessels as follows:

The deadweight tonnage, cargo capacity, and the year built, were as follows:

*251 The propelling machinery of all the requisitioned ships consisted of reciprocating steam engines and oil-burning boilers of scotch type. All were driven by single screws and were fitted with contra propellers, except the Mexican and Virginian, both of which had twin screws. The speed in nautical miles per hour of each vessel, the indicated horsepower of its engines, its normal fuel consumption in barrels of fuel oil per day while operating at sea and its “cruising radius,” indicating the maximum length of voyage which the vessel could perform without refueling were as follows:

All the requisitioned ships had three complete cargo decks, except the Virginian, which had four decks, and the Illinoian, which had two decks. All the ships also had a platform deck or partial deck (“orlop” deck) in No. 1 lower hold, except the Illinoian, Kentuckian, and Virginian. The cargo hatches of all the requisitioned ships were each equipped with at least two steam winches and two booms (constituting one “set” of cargo gear), and some ships had two “sets” of cargo gear at some hatches. Most of the ships were also equipped with special gear for heavy lifts and special lockers for carriage of valuable cargo.
All of the requisitioned ships had been well maintained and were in seaworthy condition at the time they were requisitioned.
We have recently rendered a decision for plaintiff in a suit for just compensation for the use of one of its vessels, American-Hawaiian Steamship Company v. United States, 129 C. Cls. 365.* The legal arguments presented in the former case *252 and the present cases are essentially the same. The proof in the former and present cases is basically the same. Therefore, much of what we said in that case is equally applicable to these cases.
The general principles appropriate to the ascertainment of just compensation were stated in American-Hawaiian Steamship Co. v. United States, supra, at page 369, as follows:
* * * Just compensation has been defined as “thé'sum which, considering all the circumstances — uncertainties of the war and the rest — * * * would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy.” Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 123-124; Olson v. United States, 292 U. S. 246, 257. This is but another way of saying that fair market value, where there is a free market, is the usual standard of just compensation. United States v. Commodities Trading Corp., 339 U. S. 121, 123; Olson v. United States, supra, p. 255; Monongahela Navigation Co. v. United States, 148 U. S. 312, 326; Boom Company v. Patterson, 98 U. S. 403, 407. Where, for any reason, property has no market, resort must be had to other data to ascertain its value, although this “involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with nicety.” United States v. Miller, 317 U. S. 369, 374. The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a “reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, 230 U. S. 352, 434.” Standard Oil Co., of New Jersey v. Southern Pacific Co., 268 U. S. 146, 156.
During the years 1942 to 1945, inclusive, when eight of the vessels in suit were requisitioned, there were no sales in the United States of large, dry-cargo freighters comparable to plaintiff’s vessels, because of the general requisition of the use of ocean-going freighters by the War Shipping Administration in April 1942, the Administration’s General Order No. 27 of April 23, 1942, prohibiting the sale or charter of such vessels unless approved by the Administrator, and other measures initiated by the War Shipping Administration under the Ship Warrants Act (55 Stat. 591, as amended, 50 U. S. C. App. 1281 et seq.; repealed July 25, 1947, 61 Stat. 449).
*253 Since there was no free market and no sales at or about the time of the takings of these eight vessels, other relevant data must be viewed and weighed in determining just compensation. United States v. Miller, supra.
The plaintiff contends values of the first eight vessels at the time of their respective takings were the following dollar amounts per deadweight ton:
Nebraskan_ $135
Dakotan_ 135
Iotecm_ 135
Nevadan_ 130
Pennsylvanian_ $130
Illinoian_ 120
Kentuckian_ 130
Columbian_ 120
These values were based on the opinions of plaintiff’s expert witnesses as to the value of the vessels in April 1941. The defendant contends that the values of these eight vessels per deadweight ton were:
Nebraskan_ $52. 30
Dakotan_ 54.18
Iowan_ 55. 80
Nevadan_ 58. 67
Pennsylvanian_ $39. 88
Illinoian_ 42. 03
Kentuckian_ 32. 42
Columbian_ 33.17
These values were based on the opinions of defendant’s expert witnesses. We do not believe that either of these sets of valuations approximate the values of plaintiff’s eight vessels at the time they were taken.
In 1939, before the beginning of the Second World War, there was a surplus of dry-cargo freighters throughout the world. This excess tonnage had the obvious effect of depress; ing the market values of such vessels. However, as a result of war casualties and restrictions and other factors a shortage of vessels developed so that by the latter part of 1940 it was difficult to obtain shipping space. Early in 1941, ships carried capacity cargoes both outward and homeward.
Until the middle of 1942 losses of cargo vessels exceeded new construction, but thereafter new construction exceeded the losses, and by the middle of 1943 the size of the fleet had been restored to the 1939 level. After the middle of 1943, new cargo ships constructed represented substantial net increases to the world fleet. However, there was no surplus of American freighters during the period of hostilities. By the end of 1944, 74 percent of the War Shipping Admin *254 istration fleet was being used for Army and Navy cargo; space for the carriage of nonmilitary cargo was allotted by the Division of Allocations of the War Shipping Administration.
In 1939, the earnings of United States-flag freighters in the foreign trades averaged between $10 and $15 per deadweight ton per annum. By the early part of 1941, the peak period of vessel earnings and market values, the plaintiff’s vessels and vessels comparable thereto were sometimes earning as high as $84 per deadweight ton per annum, with profits sometimes over $60 per deadweight ton, exclusive of overhead, depreciation, and taxes.
An important factor in determining the value of these eight vessels, of course, is the actual sales price of comparable vessels in the last free market. Smith-Douglas v. United States, 126 C. Cls. 758, cert. den. 348 U. S. 815. Indeed, this is a good starting point for the making of an intelligent estimate of what these ships would have brought on the dates of requisition, had there been a free market at that time, although this was, in the case at bar, a highly inflated price. In August 1939 one Hog Island freighter, which is a dry-cargo steamer with a deadweight capacity of about 8,000 tons and an average speed of 10 knots sold at a price of $11.62 per deadweight ton. In January and February 1940, three of these vessels were sold at an average price of $42.50 per deadweight ton. In January 1940, plaintiff sold five of its vessels, which were comparable to the eight vessels involved here, at the following prices per deadweight ton: the Canadian at $42.83, the Delawarean at $46.97, the Louisianan at $46.82, the Indianan at $45.02, and the Tennessean at $41.04. The average price received by plaintiff was $44.53 per deadweight ton, which was a little more than $2 per deadweight ton more than what Hog Island vessels sold for during the same month. From May through December 1940, seven Hog Island freighters were sold at an average price of $59.02 per deadweight ton per ship.
The only private sales of large freighters in the United States market in 1941 were sales of the Hog Island type. A summary of such sales which occurred between January *255 17 and April 29, 1941, is set forth below. The term “sound condition price,” as distinguished from market price, includes the purchase price, any commission or agency fee paid by the buyer, and the cost of any repairs or reconditioning incurred by the buyer to put the vessel in sound operating condition.

No repairs were required to place any of these vessels in a sound operating condition with the exception of the Melvin H. Baker, on which the buyer expended $54,620 for repairs.
So that, prices rose in a year and a half after the outbreak of the war in Europe from $11.62 a deadweight ton to an average of $86.15.
Although the April 1941 value was highly inflated, still, if plaintiff had been able to sell his vessels for this price at the date of requisition, it would be difficult to refute the statement that it would be unjust to pay it less. But could it have done so, had it been permitted to sell them to anyone other than the United States? Between April 1941 and the dates of requisition, there occurred a series of historic events, which, in our opinion, reduced the values of plaintiff’s vessels below the amounts which plaintiff could have obtained had it sold them in 1941. These events were: the President’s Proclamation of May 27,1941, declaring the existence of an unlimited national emergency; the introduction and passage of the Ship Warrants Act, sufra; the orders and regulations of the Maritime Commission, the War Shipping Administration and other agencies necessary to the successful prosecution of the war; the entrance of the United States into World War II with the conditions which arose out of the necessity for utilizing the Nation’s entire merchant fleet for purposes essential to the conduct of the war; and *256 sinkings and other war damage and other conditions which resulted in more frequent and longer lay-ups for repairs, shortage of fuel, delays by convoy operations; longer and in many cases unprofitable voyages, overstraining of machinery, changes in trade services and routings, congestion and delays in loading and unloading, wartime red tape, and inspection and certification in connection with blockades.
As shown in detail in the findings, by 1943 the tonnage of new ships constructed had exceeded the amount destroyed, and from then on our merchant fleet grew further and further beyond what it was in 1939. On January 1, 1945, the Director of War Mobilization and Reconversion reported to the President and Congress that, as against 1,100 seagoing vessels in 1939, we would have at the end of the war 5,700 vessels, including 2,500 Liberty ships, and 2,500 C-type and Victory ships, in addition to 700 old ships built before the war. These new vessels completely outmoded the old ones for peacetime use, although there was use for all ships, both old and new, during the war and for a year or so thereafter.
On the other hand, before the passage of the Ship Warrants Act, and the regulations of the War Shipping Administration, earnings of nearly all vessels were very high; freight rates had risen from $3.25 a ton to $7.50, and in some cases even more. With such rates a purchaser of one of these vessels could probably have recaptured its costs within three or four years.
However, the restrictions imposed by the Ship Warrants Act and the regulations of the War Shipping Administration, and other war conditions, were actually in effect when the ships were requisitioned and these depressed earnings and values, and, so, we must seek to ascertain the value a willing seller and a willing buyer would have been able to agree upon in the light of these restrictions. The following consolidated table presents the facts with regard to each vessel, so far as they can be shown statistically:

*257

*258 In addition, witnesses have testified as to the condition, characteristics, and value of each vessel. We have taken into consideration the general characteristics of each of the vessels, their physical condition, age, depreciation, the earnings before requisition, prospective earnings, the sales prices of comparable vessels in the last free market, the supply and demand for vessels, the operating conditions during the war, the uncertainties of the war, and legislative and administrative restrictions, and have concluded that the amounts set forth below represent what a willing buyer would have given a willing seller for eight of plaintiff’s vessels at the time they were taken.

It will be noted that there are differences in the amount allowed per deadweight ton. This is due to the testimony of the witnesses and other evidence as to the varying characteristics and condition of the several vessels.
We have found a somewhat lower value for the Oobmibian in proportion to the values found for the others. This is partly because when she was taken the end of the war was in sight, and, therefore, the end of her useful life.
The figures we have adopted do not include any sum for enhancement in value due to the causes that necessitated the taking. As shown in the findings, such enhancement, if any, was negligible.
The foregoing does not apply to the Mexican and Virginian which were taken when there was a free market, on May 14, 1946 and May 23, 1946, respectively. The plaintiff contends that the values of the Mexican and Virginian when they were taken were $622,125 and $551,250, respectively, which is $45 per deadweight ton for each. The defendant *259 contends tbat their values were $268,000 and $252,000, respectively, which is about $19.39 and $20.57 per deadweight ton, respectively.
On March 8, 1946, the Merchant Ship Sales Act of 1946 (60 Stat. 41) was enacted. That statute authorized the Maritime Commission to dispose of war-built merchant vessels to citizens of the United States at a “statutory sales price” which, in the case of dry-cargo vessels, was 50 percent of the prewar domestic cost. The Act also provided that the statutory sales price was to be depreciated at the rate of five percent per annum from the date of construction of the vessel and permitted the Maritime Commission to make a further deduction of three percent per annum for excessive wear and tear by reason of war service. Floor prices equivalent to 31 y2 percent of the domestic war cost of the Liberty-type vessels and to 35 percent of the domestic war cost of other dry-cargo vessels were established. In addition, the Act provided that citizens of the United States could buy these war-built vessels at the established prices by making a down payment of 25 percent thereof and paying the balance in twenty annual installments, bearing interest at the rate of 314 percent per annum.
On April 13, 1946, the Maritime Commission issued its General Order No. 60 promulgating rules and regulations for sales under the Merchant Ship Sales Act of 1946. For the standard Liberty cargo vessel, a ship of 10,800 tons deadweight capacity and a speed of 11 knots, the floor price set forth in the order was equivalent to $50.42 per deadweight ton. For the standard Victory cargo vessel, which was a modern vessel of 10,800 deadweight capacity and a speed of 15.3 knots, the floor price established in the order was equivalent to about $81.40 per deadweight ton.
As a result of the size and composition of the post-war merchant fleet and the passage of the Merchant Ship Sales Act, there was virtually no demand by American ship operators for old, dry-cargo vessels, such as the Mexican and the Virginian when they were requisitioned in May 1946. There was, however, a market in the United States for the sale of such freighters to foreign buyers.
*260 Included among the sales to foreign buyers were thirteen freighters of over 10,000 tons deadweight capacity, and varying in age from 25 years to almost 43 years at the time of the sales. The sales prices ranged from $240,000 to $445,000 per ship. There were also eleven sales of dry-cargo freighters of more than 9,000 tons deadweight capacity and varying in age from about 25 years to more than 29 years on the dates of sale. The sales prices ranged from $150,000 to $400,000 per ship.
When they were requisitioned, the Mexican was more than 39 years old and the Virginian was nearly 43 years old. Among the sales to foreign buyers, the vessel which was nearest in age and size to the Mexican and Virginian was the President Johnson, a vessel of 15,167 tons deadweight capacity, which was more than 42 years old at the time of sale. This vessel had originally been a combination passenger-cargo ship, but had been converted to a dry-cargo freighter. She -was sold in December 1946 at a price of $240,000.
Among the sales in 1946, there was also the William luckenbach, which was comparable in age to the Mexican and Virginian. She was a dry-cargo freighter of 10,901 tons deadweight capacity and was more than 33 years of age when sold in December 1946. She was sold for a price of $445,000.
In 1946, plaintiff sold five of its dry-cargo freighters to foreign buyers. The Utahan was sold in May 1946 at a price of $320,000; the Kansan was sold in August 1946 at a price of $350,000; the Oarolinian was sold in August 1946 at a price of $380,000; the Arizonian was sold in October 1946 at a price of $385,000, and the Georgian was sold in November 1946 at a price of $360,000.
The prices paid by the foreign buyers in 1946 represented prices for the vessels in their condition at the time of sale without regard to any expenditures required to place them in sound operating condition.
The following table gives the statistics relative to the Mexican and the Virginian and comparable vessels:

*261

*262 Taking into consideration the general characteristics of the Mexican and the Virginian, their age, and the sales prices of comparable vessels, we conclude that a willing buyer would have given a willing seller $320,000 for the Mexican, and $300,000 for the Virginian.
Plaintiff is entitled to recover the sum of $2,510,577.79, representing the balance of just compensation for the taking of each of plaintiff’s ten vessels, in the following amounts, which are the amounts we have found to be just compensation for the taking of each vessel, less the amounts already paid:
Nebraskan_ $336,401.50
Dakotan_ 258, 533. 50
Iowan_ 257,024. 75
Nevadan_ 279,184.75
Pennsylvanian 188, 712.50
Kentuckian_ 253, 603.50
IlUnoian_ 221, 702. 00
Columbian_ 349, 614.17
Mexican_ 184, 377. 05
Virginian_ 181,424.07;
and as compensation for delay in payment, computed at 4 per cent per annum on the amounts set out in findings 48 and 50 from the date of taldng of each of the vessels, the Nebraskan on December 2,1942, the Dakotan on December 12,1942, the Iowan on December 26,1942, the Nevadan on January 17, 1943, the Pennsylvanian on June 30, 1944, the Illinoian on June 30, 1944, the Kentuckian on June 30, 1944, the Columbian on January 8, 1945, the Mexican on May 14, 1946, the Virginian on May 23,1946, to the date of payment of 75 per cent of the amount determined by the War Shipping Administration as just compensation, as set out in finding's 4 and 5, plus interest on the amounts set out immediately above from the date of the payments made as set out in findings 4 and 5 to the date of the payment of the judgment herein.
Entry of judgment is suspended pending the filing of a stipulation by the parties showing the amount due plaintiff computed in accordance with this opinion.
LaeamoRE, Judge; MaddeN, Judge; LittletoN, Judge; and JoNEs, Chief Judge, concur.
*263 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff brought these actions to recover just compensation for the requisition of title to ten vessels, and the suits were consolidated for trial by order of the Court.
The petitions covering the Pennsylvanian (No. 49126), the Illinoian (No. 49141), and the Kentuckian (No. 49136) each included a cause of action for just compensation for the use of the vessel while under requisition on a bareboat basis prior to the requisition of title in addition to a cause of action for taking of ownership. Only the latter causes of action were tried as part of the consolidated cases. The causes of action for just compensation for use were deferred awaiting the outcome of plaintiff’s suit (No. 48758) involving compensation for use of the SS. Hawaiian (129 C. Cls. 365).
2. The plaintiff, American-Hawaiian Steamship Company, is a New Jersey corporation organized in 1899, with an office and principal place of business at 90 Broad Street, in the City and State of New York, and was the sole owner of the American steamships, Nebraskan, Dakotan, Iowan, Nevadan, Pennsylvanian, Kentuckian, Illinoian,, Columbian, Mexican, and Virginian (hereinafter sometimes referred to collectively as the “requisitioned ships”), at and prior to the times when defendant requisitioned and took the possession and ownership of those vessels as set forth in Finding No. 3. There were no mortgages, liens or other encumbrances on the “requisitioned ships” at the times of their respective takings.
Since plaintiff’s incorporation, its principal business has been that of owner and operator of steamships in the inter-coastal trade and, from time to time, in the foreign trade of the United States.
Plaintiff has never received any subsidy from the United States Government either for the construction or operation of its vessels.
Plaintiff’s fleet consisted of thirty-nine large freighters, including the “requisitioned ships,” when World War II *264 started in September 1939 and of thirty-two freighters on December 7, 1941, when Pearl Harbor was attacked. The other seven vessels had been sold by plaintiff to foreign buyers during the first half of 1940.
3. Between December 2, 1942, and May 23, 1946, the defendant, acting through the War Shipping Administration, took for public use the possession and ownership of all the “requisitioned ships,” including their consumable stores, broached and unbroached, equipment and all spare parts applicable to them, whether on board or ashore. The takings were by requisition under authority of Section 902 (a) of the Merchant Marine Act, 1936, as amended (53 Stat. 1254). The time and place of each taking was as follows:

In the period from December 2, 1942 to January 8, 1945, when eight of the above-named vessels were requisitioned, there was no market in the United States for such vessels because of the conditions hereinafter described. However, in May 1946, when the Mexican and Virginian were requisitioned, there were private sales of similar vessels and a market for the Mexican and Virginian.
4. By notices each dated November 11, 1944, and entitled “Notice of Proposed Tender of Just Compensation,” the War Shipping Administration made a “proposed tender” to plaintiff of a sum in respect of the taking of each of the first seven vessels listed in Finding 3 “plus allowance for delay in payment at %% per annum on outstanding balance” from the *265 date of taking to November 13, 1944. Three of the notices also contained a paragraph specifying an amount described as “outstanding repairs necessary to place vessel in tight, staunch, strong and in every respect seaworthy condition at time of delivery to WSA.” In the cases of each of those three vessels, the principal amount tendered as just compensation was the amount which the Administrator determined to be the value of the vessel at the time of its taking less the amount of such “outstanding repairs.” The principal amounts so tendered and the amounts specified as “outstanding repairs” were as follows:

In terms of amount per deadweight ton, the principal amounts of the tenders so made (disregarding the deductions for outstanding repairs and dividing by the deadweight tonnages of the respective ships as stated in Finding 7 (c)), were equivalent to the following:

Per d. w. t.

Per d. w. t.

Nebraslcan_$62.74
Dalcotan_ 65. 87
Iowan_ 70.10
Nevadan_ 61.67
Pennsylvanian_$55. 62
IMnoian_ 54. 41
Kentuckian_ 43. 53
On December 13, 1944, plaintiff wrote the War Shipping Administration that the amount of the “proposed tender” set out in each of the foregoing notices was unsatisfactory to plaintiff.
On April 11,1945, the War Shipping Administration paid plaintiff certain sums amounting to 75 percent of the principal amounts of the “proposed tenders” of just compensation for said seven takings, as follows:

*266
Amount of payment on account

Vessel:
Nebraskan_$558,325. 50
Dakotan_ 502,657.50
loman_ 521,057.25
Nevadan_ 456, 674.25

Amount of payment on account

Vessel:
Pennsylvanian _ $424,432.50
Illinoian_ 441,564.00
Kentuckian_ 324, 031. 50
5. By letters both dated September 1, 1948, in respect of the takings of the ownership of the Colitmbimi and the Mexican, and by letter dated July 22,1948, in respect of the taking of the ownership of the Virginian, the United States Maritime Commission, to which on September 1, 1946, the duties of War Shipping Administration had reverted, notified plaintiff that the Commission had found the sum set forth below after the name of the vessel “constitutes just compensation (including damages for delay in payment)” for the vessel, “determined in accordance with Section 902 (a) of the Merchant Marine Act, 1936, as amended, as said section is construed by applicable decisions of the General Accounting Office”:

Amount of tender (including

Vessel: interest)
Columbian_$153,847. 77
Mexican_ 180,830.58
Virginian_ 158,100. 53
In terms of amount per deadweight ton, the sums so tendered were equivalent to the following:

Per d. w. t.

Columbian_$16.21
Mexican_ 13.08
Virginian_ 12. 91
On July 26, 1948, with respect to the Virginian, and on September 8, 1948, with respect to the Golwmbian and the Mexican, plaintiff wrote the Maritime Commission that the amounts determined by the Commission as just compensation for the takings of ownership of those vessels were unsatisfactory to the plaintiff.
On January 18,1949, the Maritime Commission paid plaintiff certain sums amounting to 75 percent of the amounts of said determinations as follows:

*267
Amount of payment on

Vessel: account
Columbian_$115,385. 83
Mexican_ 135, 622. 95
Virginian_ 118,575.93
6. Plaintiff’s acceptance of the amounts paid, as stated in Findings 4 and 5, by defendant’s agencies on account of just compensation for the taking of ownership of the requisitioned ships, was without prejudice to plaintiff’s right to sue the United States in these suits to recover further sums as “will make up such amount as will be just compensation.”
Plaintiff has not made any assignment or transfer of its claims for just compensation for the defendant’s takings of the ownership of the requisitioned ships or of any part of or interest in such claims.
7. (a) All the requisitioned ships were, at the times of their respective takings, steel, steam freighters registered under the laws of the United States, classed A-l by the American Bureau of Shipping and holding unexpired Certificates of Inspection by the United States Coast Guard authorizing them to navigate the “oceans” without restriction.
(b) Five of the requisitioned ships, the Dakotam,, the Iowan, the Pennsylvanian, the Kentuckian, and the Meodean were designed and built for plaintiff. The others were all acquired by plaintiff at various times prior to 1930 from other private owners. None, except the Illinoian, was war-built or constructed by or for the United States Government. The particulars of their build are:

*268 (c) The carrying capacity of the respective requisitioned ships is shown in the table set forth below. The term “Deadweight tonnage” in the table means the vessel’s carrying capacity for cargo, fresh water, stores, and permanent bunkers, expressed in tons of 2,240 pounds each, when the vessel is loaded to the draft corresponding to her summer freeboard fixed by the vessel’s International Load Line certificate. The deadweight tonnages were all certified by the American Bureau of Shipping. In the table below, the figures shown under “Cargo capacity” were taken from the capacity plans of the vessels. The table shows the cargo capacity of each vessel, exclusive of the spaces in the deep tanks.

(d) The propelling machinery of all the requisitioned ships consisted of reciprocating steam engines and oil-burning boilers of scotch type. All were driven by single screws and were fitted with contra propellers, except the Mexican and Virginian, both of which had twin screws. The table below sets forth the speed in nautical miles per hour (knots) of each vessel, the indicated horsepower of its engines, its normal fuel consumption in barrels of fuel oil per day while operating at sea and its “cruising radius”, indicating the maximum length of voyage which the vessel could perform without refueling.

*269

(e) All tlie requisitioned ships had three complete cargo decks, except the Virginian, which had four decks, and the Illinoian, which had two decks. All the ships also had a platform deck or partial deck (“orlop” deck) in No. 1 lower hold, except the Illinoian, Kentuckian, and Virginian. The cargo hatches of all the requisitioned ships were each equipped with at least two steam winches and two booms (constituting one “set” of cargo gear), and some ships had two “sets” of cargo gear at some hatches. Most of the ships were also equipped with special gear for heavy lifts and special lockers for carriage of valuable cargo. The number of hatches, “sets” of cargo gear and the heavy lift capacity of the respective ships were as follows:

8. All of the requisitioned ships had been well maintained by plaintiff and were in seaworthy condition at the time they were requisitioned.
As stated in Finding 4, the defendant deducted from the amounts determined as just compensation for the Nebraskan, Iowan, and Nevadan certain amounts for repairs to the three *270 vessels. The three vessels were surveyed by ship surveyors representing plaintiff and defendant respectively, and the amounts deducted for outstanding repairs were based on cost estimates contained in the reports of defendant’s surveyors. The defendant’s surveyors did not find that any of the three vessels was in an unseaworthy condition but, with respect to a number of items, they made notations indicating conditions to be repaired. Each of these items was accompanied either with the notation “Record” or “Deferred,” which meant that there was no immediate need for the repairs but that the repair work would be required at some later date in order to keep each vessel in good condition. The vessels were in seaworthy and serviceable condition for normal operation without the need of these repairs at the time of the taking. The deduction of the amounts for repairs referred to in finding 4 were not justified.
In the survey report covering the Dakotan, the defendant’s surveyor estimated that the cost of correcting the items marked “Record” in the report would be $14,130. However, the Director, Division of Foreign Repair and Survey Operations, War Shipping Administration, subsequently determined that there were no outstanding items of repair necessary to the Dakotan, and at the time the defendant made its tender of just compensation for that vessel, no deduction was made for repairs.
There are no issues with respect to repairs on any of the remaining vessels involved in this action.
9. During the years 1942 to 1945, inclusive, when eight of the vessels in suit were requisitioned, there were no sales in the United States between willing buyers and willing sellers of large, dry-cargo freighters comparable to plaintiff’s vessels. The absence of any such sales was due to the introduction and enactment of the Ship Warrants Act, the general requisition of the use of oceangoing freighters by the War Shipping Administration in April 1942, the Administration’s General Order No. 27 of April 23,1942, prohibiting the sale or charter of such vessels unless approved by the Administrator, and other measures initiated by the War Shipping Administration in the conduct of the war shipping program.
10. During the fiscal years 1943 to 1946, inclusive, the *271 United States Maritime Commission constructed or purchased from builders a large number of new freighters of the Victory and “C” type, in addition to several thousand Liberty ships. Among these modern vessels was the C-2, which had a deadweight tonnage of 10,875 and was similar in size to a number of the requisitioned ships. Except for such similarity in size, however, the C-2 freighters were not comparable to plaintiff’s vessels. The C-2 freighters were new and of modern design and equipment. Their speed was considerably greater than the speed of plaintiff’s vessels and they could operate on less fuel.
During the fiscal years referred to, twenty-four of the C-2 type freighters were sold to private American ship operators without the aid of a construction differential subsidy at an average price of $254 per deadweight ton.
11. During the spring of 1942, the War Shipping Administration acquired a number of laid-up vessels under circumstances which were described in a statement made by the Deputy Administrator of the War Shipping Administration to the House Committee on Appropriations on May 15, 1943, as follows:
During the spring of 1942 when the rate of sinkings by enemy action was so heavy, particularly along our shores, the War Shipping Administration surveyed the ports of the United States and some foreign ports for laid-up vessels, vessels for the most part 20 to 40 years old which had become unprofitable for commercial operation, either by reason of needed repair, lack of modern crew accommodations, or damage by collision or enemy action. Although the cost of rehabilitating these vessels was high — higher than could be justified by commercial standards — the need for shipping was so great that the saving in steel and time, compared with new construction, made it advisable to rehabilitate as many of these vessels as possible. As a result of this program approximately 315,000 dead-weight tons of shipping was added to the fleet by rehabilitation of laid-up vessels at a cost of approximately $130 per dead-weight ton; and 260,000 dead-weight tons from vessels damaged by enemy action at a cost of approximately $76 per dead-weight ton.
Except as indicated in the statement quoted above, the evidence does not establish the particulars of any of the vessels that were acquired under this program.
*272 12. In 1939 before the beginning of the Second World War, there was a surplus of dry-cargo freighters throughout the world. This excess tonnage had a particularly depressing effect on the domestic market values of such vessels. However, with the events that transpired during the war a shortage of vessels developed so that by the latter part of 1940, it was difficult to get shipping space. Early in 1941, capacity cargoes were available both outward and homeward.
The principal causes of this shortage were (a) sinkings, (b) diversions by belligerents of their own vessels to military use or for employment in combat areas from which our shipping was excluded by the Neutrality Act of November 4, 1939, and (c) a decrease in the effectiveness of merchant vessels by war conditions.
On September 1, 1939, the world supply of freighters totaled 8,232 vessels having a registered gross tonnage of 30,589,084. Thereafter, from December 1939 through June 1942, the monthly losses through sinking or destruction greatly exceeded new construction and resulted in a substantial decrease in the total world supply of freighters.
By the end of 1941, the allied and neutral countries had lost 2,612 dry-cargo ships, aggregating 8,640,489 gross tons, or a net loss in excess of new construction of 2,178 dry-cargo ships, aggregating 5,943,160 gross tons. The numerical loss was equivalent to approximately 30 percent of the total allied and neutral merchant dry-cargo fleets as they existed on September 1, 1939. Beginning with the second half of 1942, new vessel construction in each month exceeded the monthly losses. By the middle of 1943, the excess of new construction over reported losses had restored the allied and neutral fleets to their size as of September 1,1939, and thereafter the new cargo ships which were constructed represented substantial net increases to the world fleet.
However, new construction was not sufficient to create a surplus of American freighters at any time during the period of hostilities. By the end of 1944, 74 percent of the War Shipping Administration fleet was being used for Army and Navy cargo as compared with 52 percent in 1943. Space for the carriage of nonmilitary cargo was allotted by the Division of Allocations of the War Shipping Administration, *273 which never had enough vessels available during the war to meet all of the demands.
14. Between September 1, 1939, and July 1,1941, belligerents, which between them owned 67.5 percent of the world’s freighter supply, had withdrawn their merchant fleets from areas outside the combat zone for use in their war efforts, or (as in the case of Germany and Italy) their fleets had been immobilized by blockade.
15. The effective world supply of freighters was further decreased by other war conditions. These included war damage and other war conditions which resulted in more frequent and longer layups for repairs, delays by convoy operations, longer voyages, overstraining of machinery, changes in trade services and routings, congestion and delays in loading and unloading, wartime red tape, and inspection and certification in connection with blockades.
16. The profitability of freighters increases sharply under conditions of shortage in supply and increase in demand, without any increase in freight rates. Such rise in profitability results from several causes: (a) carriage of a greater quantity of cargo per voyage increases a freighter’s revenue without correspondingly increasing the cost of her operation because a large portion of a freighter’s operating expenses are constant and do not vary with the quantity of the cargo carried. In economics, this result is called the principle of “increasing returns”; (b) carriers can obtain a larger proportion of relatively high value cargo which produces greater revenue per unit of cargo; (c) better utilization of a freighter’s capacity becomes possible because, from the greater amount of cargo available per voyage, carriers can select combinations of bulky goods and heavy goods in such proportions as to put their vessels “full and down,” that is, to fill their cubic capacity and also use their entire deadweight capacity, and thus carry maximum cargoes producing maximum revenue.
17. The decrease in the effective world supply of freighters in the 1939-1941 period was accompanied by an increased demand for oceangoing transportation service. During the same time, there was a sharp rise in the earnings of privately *274 owned United States-flag freighters because of the conditions described below:
(a) The total shipments and receipts of oceanborne dry cargoes in the United States foreign trade (all flags) increased from 47.5 million tons in 1989 to 51.1 million tons in
1940, and declined for the year 1941 to 49.8 million tons. The proportion of this traffic carried by United States-flag freighters increased from 11.9 million tons in 1939 to 21.1 million tons in 1941, while the carryings on foreign-flag vessels declined from 35.6 million tons in 1939 to 28.7 million tons in 1941. The increased traffic carried by United States freighters did not include munitions of war or other traffic to or from the combat zones in Europe, because the Neutrality Act excluded our merchant vessels from those zones.
(b) There was an increase in the proportion of traffic in more valuable cargoes and a better utilization of cargo space.
The more effective utilization of available cargo space is illustrated by a comparison of the net register tonnage of entries of ships at customhouses in United States ports, with the increased carryings by United States-flag freighters during the years 1939 through 1941. A net register ton is about 100 cubic feet of carrying capacity. The net register tons of oceangoing dry-cargo vessel entries of all flags declined from 45,098,000 net register tons in 1939 to 29,437,000 net register tons in 1941. The net register tonnage of American-flag entries during the years stated remained relatively constant, being 12,200,000 tons in 1939 and 12,128,000 tons in 1941. Practically all of this decline was in foreign-flag entries.
The shift in the composition of cargo to more valuable and more profitable commodities resulted from an increase in the proportion of exports of finished goods and manufactured articles from the United States to areas which had previously obtained such goods from Europe. The average value of United States imports and exports per long ton increased from $58.51 in 1939 to $83.70 in 1941.
(c) Business conditions and activities improved greatly during the two-year period. The indices of national income, gross business product, corporate income, and other business indices rose rapidly as follows:

*275

(d) Rate-cutting practices were eliminated, and there was a substantial increase in freight and charter rates above the depressed levels which existed at the outbreak of the war.
18. In a free market, the market value of dry-cargo freighters is determined primarily by what buyers and sellers estimate the immediate or relatively short term net earning prospects of such vessels to be. The earnings of freighters are derived principally from berth operations and from charter operations.
In a berth operation, the shipowner is a common carrier transporting goods for the general public at freight rates fixed in conference or other tariffs. In a berth operation, the shipowner receives the entire earnings of the vessel and also pays all expenses of ownership and operation.
In a charter operation, a single charterer contracts with the shipowner for the entire carrying capacity of the vessel in consideration of which the charterer agrees to pay the shipowner either a monthly rate of charter hire, as in the cases of bareboat charters and time charters, or an agreed freight per voyage, as in the case of voyage or trip charters. Voyage charter freight may be fixed at a stated rate per ton or other unit of cargo (a rate charter), at a stated rate per unit of the vessel’s cargo space (a space charter), or at a lump sum (lump sum charter).
Under the usual bareboat charter, the charterer has full possession and operation of the vessel and pays all expenses, including upkeep.
Under the usual time charter, the shipowner retains possession and operation of the vessel and pays for her supplies, crew, repair and ordinary insurance, but the charterer pays *276 for fuel, cargo and port expenses and also for war risk insurance on the vessel.
If a charterer is a common carrier or if he subcharters to others, his profit is the difference between (a) the charterer’s revenue from freights which he obtains from the actual shippers of cargo or from the subcharterer, and (b) the charterer’s expenses which include charter hire or freight and such vessel, voyage, cargo or other expense as the terms of the charter may place on the charterer.
19. In 1939, the earnings of United States-flag freighters in the foreign trades averaged between $10 and $15 per deadweight ton per annum.
The extent to which some rates had increased by the first half of 1941 is demonstrated by the following examples: Rates on ore from India were increased from about $5.00 a ton to $25.00 a ton. Rates on sugar from the Philippines increased from $8.00 a ton to $25.00 and $30.00 a ton, and linseed from the River Platte from about $3.50 a ton to $20.00 and $25.00 a ton. Time charter rates increased rapidly from $1.75 per deadweight ton to $7.50 and a few charters provided for rates of $10.00 to $12.00 per deadweight ton.
A summary prepared by certified public accountants from voyage reports submitted by various shipping companies to the Maritime Commission of the earnings of old, large American freighters (7,000 deadweight tons and over and built before 1935) on voyages terminating in the last quarter of 1941 or early 1942 reflects the following:
(a) On vessels which were operated by their owners, the average operating profit before depreciation and overhead, amounted to $5.50 per deadweight ton per month on sixty-eight foreign overseas voyages; to $3.55 per deadweight ton per month on forty-nine nearby foreign voyages, and $2.64 per deadweight ton per month on fifty-five domestic voyages.
(b) On vessels which were time-chartered to others, the owner’s average profit before depreciation and overhead, amounted to $4.44 per deadweight ton per month on seventeen foreign overseas voyages, and to $4.73 per deadweight ton per month on two nearby foreign voyages.
(c) On vessels which were chartered from the United States Maritime Commission on a bareboat basis, the *277 charterer’s average operating profit before the payment of bareboat hire amounted to $4.88 per deadweight ton per month on forty-six foreign overseas voyages. After the payment of bareboat hire, which averaged $2.21 per deadweight ton per month, the charterer’s net profit amounted to $2.67 per deadweight ton per month on the forty-six voyages.
20. In 1941, plaintiff time-chartered ten of its vessels to other American operators at rates varying from $5.00 to $8.25 per deadweight ton per month. Included among the ten vessels were the Illinoian and the Kentuckian, which were chartered at a rate of $7.00 per deadweight ton per month. Under the time charters, the vessels made eleven voyages, consisting of one voyage by nine vessels and two voyages by one vessel (the Honolulan). Plaintiff’s average profit before overhead, depreciation, and taxes on the time charters amounted to $4.83 per deadweight ton per month, and with a deduction for overhead to $4.66 per deadweight ton per month. All of the voyages began in 1941 and all, except two, ended in the same year. Two of the voyages began in July 1941, and the last voyage terminated on April 17, 1942.
Plaintiff’s vessels, the Alabaman, AlasTean, American, Arkansan, Columbian, Hawaiian, Kansan, Montanan, Oklahoman, and Pennsylvanian each made one voyage to the Red Sea and return on the basis of a space charter to the Red Sea and on a regular berth basis homeward. The voyages began during the year 1941 and ended during that year or in 1942. On the ten voyages, plaintiff’s average profit before overhead, depreciation, and taxes, amounted to $5.68 per deadweight ton per month. With a deduction for overhead, the average profit was $5.49 per deadweight ton per month.
Plaintiff’s vessels, the Ohioan, Kentuckian, and Minnesotan each performed one voyage to South Africa and return, the voyages ending in 1941 or 1942. The vessels were operated by plaintiff on a regular berth basis, and its average operating profit before overhead, depreciation, and taxes, amounted to $4.31 per deadweight ton per month, and with a deduction for overhead, such average profit was $4.14 per deadweight ton per month.
*278 21. From the outbreak of the war in Europe in September 1939 to about May 1,1941, there was a general upward trend in the market prices of large, dry-cargo freighters on the American market. This rise in market prices was due to the factors described in preceding findings.
The Maritime Commission permitted the sales of privately owned American freighters to foreign buyers through December 1940, and the British Government entered the United States ship market in December 1939 with a flat offer of $40 per deadweight ton for any cargo ship in operating condition. About the middle of 1940, after the British had exhausted the supply of ships available at that price, they increased their offer to $60 per deadweight ton and purchased a number of vessels at that price. A few vessels were also purchased by the French. Although the British took the best vessels that were available at the prices offered by them, they purchased whatever ships that could be obtained at the flat prices stated above, regardless of the size, age, or condition of the vessels, provided the ships were able to operate and to carry cargo. These purchases in the American market by the British Government had the effect of establishing a base or floor price on all sales of dry-cargo freighters in the domestic market during 1940.
The upward trend in the freighter market in the United States during the period stated is illustrated by the sales of a number of Hog Island type vessels, which are dry-cargo steamers with a deadweight capacity of about 8,000 tons and an average speed of 10 knots per hour. In August 1939, one Hog Island freighter was sold at a price of $11.62 per deadweight ton, but in January and February 1940, three of these vessels were sold at an average price of $42.50 per deadweight ton.
In January 1940, plaintiff sold five of its vessels at the following prices per deadweight ton; the Canadian at $42.83, the Delawarean at $46.97, the Louisianam at $46.82, the Indianan at $45.02, and the Tennessean at $41.04. The average price received by plaintiff was $44.53 per deadweight ton.
From May through December 1940, seven Hog Island freighters were sold at an average price of $59.02 per deadweight ton per ship.
*279 In May 1940, plaintiff sold the Californian and the Missourian at a price of $77.27 per deadweight ton for each vessel. However, these vessels were not comparable, either to Hog Island type freighters or to the requisitioned ships. The Californian and Missourian were 11,000-ton, Diesel-powered freighters and were the newest of the thirty-nine vessels in plaintiff’s fleet in 1939.
22. The only private sales of large freighters in the United States market in 1941 were sales of the Hog Island type vessels. A summary of such sales which occurred between January 17 and April 29, 1941, is set forth below. The term “sound condition price”, as distinguished from market price, includes the purchase price, any commission or agency fee paid by the buyer, and the cost of any repairs or reconditioning incurred by the buyer to put the vessel in sound operating condition.

No repairs were required to place any of these vessels in a sound operating condition with the exception of the Melvin H. Baker, on which the buyer expended $54,620 for repairs.
If the eight vessels which were requisitioned from plaintiff during the 1942-45 period had been sold on the April 1941 market, a comparison with the 1940 sales prices indicates that plaintiff’s ships would have brought higher prices than the six vessels sold in 1941. Except for the IWmoian, which was a war-built vessel, all of plaintiff’s vessels were constructed in private shipyards and were of stronger and better construction than the Hog Island freighters; they were also of greater size and speed, and under the conditions which existed in 1941, they had a greater earning capacity. On the other hand, the average age of the requisitioned ships, except the Illinoim, was about eight years more than the average age of the Hog Island ships. In addition, plaintiff’s vessels *280 were equipped with reciprocating engines which are less efficient than turbine engines, which are used in most modern vessels.
In addition to the ships listed in the table above, the only other private sale in April 1941 was of the American freighter, the Unaco (ex Golden Sword), a 23-year old steamer of 6,000 deadweight tons. However, the evidence does not establish the sound condition market price of the Unaco, because the vessel was purchased by an agent for the owner, and the purchase price of $500,000 included the agent’s fees for services rendered in equipping, repairing, and manning the vessel for the buyer. More than $200,000 was expended in extensive repairs to and reconditioning of the vessel.
23. In May 1941, the bill which was enacted on July 14, 1941, as the Ship Warrants Act, was introduced in Congress. The introduction of this proposed legislation ended the free market for large freighters in the United States, because the purposes and effect of the bill were well understood by people in the shipping business. They recognized that the passage of the law meant that the entire merchant marine of the United States would be controlled by the Government thereafter during the continuance of the war.
However, on October 17, 1941, there were two private sales of large freighters in the United States, both being Hog Island steamers. The Hoosier (ex Black Eagle) was sold at a sound condition price of $84.28 per deadweight ton and the Green Moimtain (ex Black Hawk) at a sound condition price of $84.69 per deadweight ton. These prices included repair costs of $9,491 for the Hoosier and $12,721 for the Green Moimtain.
24. During the period from 1942 to 1946 inclusive, the value of both United States and world exports and imports rose to and remained at substantially higher levels than in 1941. The value of United States exports and imports for nonmilitary purposes per net register ton of cargo space entering and clearing United States ports also rose to and remained at levels considerably above those that prevailed in 1941. Corporate income (before income and excess profits taxes), of industries rose considerably above and re *281 mained at levels exceeding the 1941 level, but the corporate income from industries engaged in water transportation declined substantially in the 1942-1946 period. Under such generally favorable economic conditions, including factors affecting the demand for and supply of shipping space as previously described, it is reasonably probable that the earnings and values of large American-flag freighters would have continued during the 1942-1946 period at levels as high as those which prevailed in April 1941 if the following significant changes had not occurred:
(a) The introduction and passage of the Ship Warrants Act;
(b) the President’s Proclamation of May 27,1941, declaring the existence of an unlimited national emergency;
(c) the orders and regulations of the Maritime Commission and the War Shipping Administration issued pursuant to the Ship Warrants Act and other authority delegated to such agencies, and
(d) the entrance of the United States into World War II and the conditions which arose out of the necessity for utilizing the Nation’s entire merchant fleet for purposes deemed essential to the conduct of the war. These war-induced conditions, hereinafter discussed in greater detail, included the general requisition of the use of all oceangoing freighters by the War Shipping Administration in April 1942.
25. The first action taken by the Maritime Commission to arrest the rapid increase in transportation charges that occurred after September 1, 1939, was contained in a letter of February 25, 1941, which was sent to steamship conferences operating outside the European War Zone. The letter directed that the Maritime Commission be given notice in advance of the effective date of any agreed increases in freight rates and required tüat a statement fully justifying the contemplated increase accompany each notice.
By letter of March 11,1941, to the owners of all vessels of United States registry, the Commission directed that any proposed sales or charters of vessels to citizens of United States, or any proposed charters to aliens be submitted to *282 the Commission for its concurrence prior to the conclusion of any sale or charter.
On May 1, 1941, the Commission wrote all owners of vessels of United States registry that despite its previous letters, further proposals were being made to increase transportation costs. The letter also stated that transportation costs had already reached the maximum justifiable under existing conditions; that some charges were excessive and would have to be amended, and that all proposals which contemplated further increases in rates would be considered as unjustifiable and as adding an unnecessary burden to the public.
According to a statement made by a representative of the Maritime Commission on March 30, 1943, during hearings before the House Committee on Merchant Marine and Fisheries, the early efforts of the United States and Great Britain at worldwide rate control included a tacit agreement that neither would condone time charters which were made in excess of $7.50 per deadweight ton per month. At the same time, it was stated that prior to this tacit understanding, some fixtures had been made at $8.00 and $10.00 per ton and others at even higher rates, and that neither the British nor the United States authorities were in position to control or have such rates reduced.
26. The enactment of the Ship Warrants Act and the President’s Proclamation of the existence of an unlimited national emergency gave the Commission considerably more authority for direct control of ocean freight rates than was previously available to it.
On July 30,1941, about two weeks after the enactment of the Ship Warrants Act, the Commission issued its press release No. 970, which established a basic time charter hire rate of $4.50 per deadweight ton per month on cargo vessels of 10,000 deadweight tons or more, with an additional allowance of 10 cents per deadweight ton per month for each one-half knot of speed in excess of 12 knots. The press release stated that it was being issued coincident with the request by the President for enactment by Congress of legislation establishing a ceiling on prices and rents and that the new scale of rates was in keeping with its long-standing policy of main *283 taining steamship charter and cargo rates at as reasonable a level as possible in order to prevent an inflationary influence on commodity prices.
This press release also stated that unless otherwise approved by the Commission, the basis of war risks insurance for the account of the charterer should not exceed $100 per deadweight ton.
The effect of the new rate schedule was to reduce the values of vessels affected by it, because the $4.50 rate represented an arbitrary reduction of $3.00 per deadweight ton below the prevailing rate.
27. On August 14,1941, the Maritime Commission adopted the Ship Warrant Regulations (46 C. F. R. 241), which became effective 80 days after they were approved by the President on August 26, 1941. These regulations provided for the issuance of a ship warrant upon an application, wherein the applicant would agree to conform to restrictions imposed by the Maritime Commission with respect to the trade route in which his vessel was to be employed, the class or classes of cargo to be transported, and the rates to be charged for such transportation. The regulations further provided that upon the issuance of a warrant, the vessel owned by the applicant would be entitled to priority use of facilities in the United States, its territories, and its possessions. These facilities included services pertaining to and physical equipment employed in loading, discharging, lighterage or storage of cargo, the procurement of bunker fuel and coal, and towing, overhauling, drydocking, or repair of vessels.
28. On January 5, 1942, the Commission issued its press release No. 1117, making public its General Order No. 49, which was dated December 30,1941, to become effective January 20,1942. The order canceled the scale of time charter rates established on July 30, 1941, and established a new basic maximum time charter rate on steamers of 10,000 deadweight tons and up of $3.25 per deadweight ton per month, with an additional allowance of 10 cents per deadweight ton per month for each knot of speed in excess of 10 knots up to 14 knots.
In order that berth rates would conform approximately with the established time charter rates, General Order No. *284 49 also required ocean freight rates to be adjusted to the level of rates in effect September 1,1940, plus any additional surcharges to be approved by the Commission to cover additional expenses due to increased costs of war risk insurance, crew insurance, crew bonus, internment insurance, and increased length of voyages. The rates established by the order were incorporated into the ship warrants system and compliance with such rates was made a condition to the continued holding of warrants and to the issuance of new warrants.
Pursuant to provisions of the order, surcharges in berth rates were authorized from time to time thereafter until the Ship Warrant Regulations were revoked in 1946.
29. On February 9, 1942, the Commission issued a press release announcing the provisions of its General Order No. 58, effective February 5, 1942. It established a scale of maximum war risk insurance valuations for vessels with respect to which the Commission assumed or assured a war risk, where it paid war risk premiums, or where war risk premiums were included as a factor in freight rate surcharges. For freighters built prior to 1929, the order provided a basic war insurance valuation of $100 per deadweight ton less a depreciation of three percent (computed without allowance for residual value) for each year of the vessel’s age, subject to a minimum of $50 per deadweight ton. The order also permitted insurance in addition to the amount of the basic valuation to the extent of 25 percent thereof, except that when the basic value was less than $60 per deadweight ton, additional insurance was permitted to bring the total insurance up to $75 per deadweight ton. The authorization for such additional insurance was subject to the further requirement that in the event of total loss, payments received from the insurance on the excess valuation were to be placed in escrow for use in new construction.
30. The American Institute of Marine Underwriters and British Underwriters adopted a special provision called “A Ship Warrant Warranty” to be inserted in ship hull insurance policies issued on and after February 20,1942, making the holding of a ship warrant a condition to the validity of the insurance.
*285 31. The Maritime Commission did not consider that it had authority to requisition vessels under Section 902 of the Merchant Marine Act of 1936 until May 27, 1941. It delayed the requisition program until April 1942, when practically the entire oceangoing merchant fleet of the country was requisitioned for use. The reasons for the delay in exercising the requisitioning power were explained by the Administrator of the War Shipping Administration in the following statements made to the House Committee on Merchant Marine and Fisheries on June 19,1943:
* * * * *
However, even if the Maritime Commission had the power to requisition before May of 1941, the exercise of that power during the high market conditions of late 1940 and early 1941 would have been most unwise and unfortunate, since the owners would then have been in a position to file suit in the Court of Claims for the full market values of that peak period. The results of such premature requisitioning would therefore have been very costly to the United States. The only sound strategy was to delay the date of requisitioning as we did until rates and values could be reduced to more moderate levels.
Under the circumstances, the Maritime Commission determined not to resort to requisition, even after May 27,1941, but to continue operations under private ownership until such time as its efforts to reduce and stabilize rates and values should produce results or the need for requisitioning should become clearer and more pressing. ‡ ‡ ‡ ^
The War Shipping Administration does not have dictatorial powers to fix values by edict. It has been our policy to fix rates and values at the lowest reasonable levels. By this is meant the lowest levels consistent with equity which can be sustained in the event of judicial attack. Any attempt to fix rates and values at levels which will force all shipowners into the courts can be justified only if there is reasonable probability that the courts would sustain such reduced rates and values. Forcing the valuations into court in the absence of such reasonable probability would merely result in the payment of higher rates and values plus interest during the interval. Wise administrative action, therefore, calls for fixing rates and values at the lowest reasonable levels that can be sustained in the courts. A drastic effort to return rates and values to 1939 levels *286 would, we believe, throw the whole matter into court and might lead to very much higher valuations and rates than those that have been established by the War Shipping Administration.
S: * * * *
The choice is believed to lie between a gamble on 1939 values, on the one hand, and on the other, authorization of rates and values at or below 1940 levels, which we believe the rates and values established by the War Shipping Administration conclusively achieve. In this connection, it should be noted that the courts invariably increased the World War I determinations of the Shipping Board by almost 50 percent as indicated in the legal memorandum contained in the committee document, even though World War I rates and values were from 150 to 400 percent higher than those now prevailing. A review of the judicial decisions arising out of the various problems relating to the first war indicate the danger of inviting litigation so long as high market values exist, and the advisability of reducing or otherwise destroying such high market values. It should also be noted that the enhancement clause does not apply to the courts. Judicial proceedings would be instituted in accordance with section 902 (d), which does not contain any enhancement clause. The courts are bound only by the Constitution.
32. Following objections made by shipowners to the rates established in General Order No. 49, the War Shipping Administration conducted a study between January 5, 1942, and May 1942. The study demonstrated the need for an adjustment to meet increases in operating costs, and on May 14,1942, the War Shipping Administration issued General Order No. 8, which established a new scale of time charter rates retroactive to January 20,1942. This order, which was issued following the general requisition of all freighters on a time charter basis in April 1942, provided for a time charter rate for steamers of 10,000 deadweight tons and over of $3.75 per deadweight ton per month on sailings prior to May 16, 1942, and at $4 per deadweight ton per month on sailings on and after May 16,1942.
The order also specified that vessels with a speed in excess of 10% knots should receive an additional sum of 10 cents per deadweight ton per month for each knot or major fraction thereof over 10% knots.
*287 33. On May 14, 1942, the War Shipping Administration issued its General Order No. 9, prescribing insurance valuations applicable to American-flag freighters chartered under the terms and conditions of charter parties tendered by the War Shipping Administration pursuant to Section 902 of the Merchant Marine Act of 1936 to the owners of such vessels. The basic valuation provided in ths order was $65 per deadweight ton, plus a speed bonus at the rate of $5 per deadweight ton for each knot or major fraction thereof over 8 y2 knots.
34. In November 1942, a dispute occurred between the Comptroller General of the United States and the War Shipping Administration regarding the application of the “enhancement clause” contained in Section 902 of the Merchant Marine Act of 1936.
On October 15,1943, the President appointed an Advisory Board on Just Compensation, which on December 7, 1943, rendered a report of its views on the principles to be followed by the Administrator of the War Shipping Administration in determining just compensation.
35. On December 15, 1943, the War Shipping Administration issued General Order No. 39, which permitted shipowners to appeal the charter or berth rates prescribed by the War Shipping Administration as a condition to the granting or continued recognition of ship warrants to the War Shipping Administrator, who was authorized to fix rates in excess of the maximum rates so prescribed.
36. On April 7, 1944, the War Shipping Administration issued its General Order No. 37, which became effective April 20, 1944. This order established (1) values of vessels with respect to risks insured or assumed by the War Shipping Administration, (2) rates of charter hire for oceangoing freighters and other vessels requisitioned for use and chartered under a requisition bareboat charter, and (3) uniform time charter rates for requisitioned and other dry-cargo vessels. The order provided various categories for the vessels to which it applied, depending upon the period during which they were built, and the valuations and rates of bareboat and time charter hire prescribed varied in accordance with the age group in which a vessel was placed.
*288 For all dry-cargo vessels built during the period 1914-1984, the basic rate of bareboat charter hire provided for in the order was $1.25 per deadweight ton per month, and additional allowances were provided for vessels with speeds in excess of 11 knots but under 16 knots.
The basic valuation provided in General Order No. 37 for freighters built during the period 1914-1934 was $56.25 per deadweight ton as of the effective date of the order, which further provided that this basic value would be reduced on April 20, 1945, and annually thereafter, by the sum of $9,375 per deadweight ton.
Additions to the basic valuation were provided for vessels with speeds of 11 to 16 knots. For a freighter with a speed equal to or more than 11 knots but not in excess of 12 knots, the additional allowance was $2.25 per deadweight ton. When the speed of the vessel was between 12 and 13 knots the allowance was $5 per deadweight ton.
The monthly time charter rate specified in General Order No. 37 for freighters built in the 1914-1934 period consisted of the monthly bareboat rate plus a monthly service charge, which varied in accordance with the deadweight tonnage of the vessel.
37. Following the report made by the Advisory Board on Just Compensation, the staff of the War Shipping Administration conducted studies for the purpose of determining just compensation, less enhancement due to the causes necessitating the taking, for vessels requisitioned for title or lost from a peril assumed by the Administration, and just compensation for the use of vessels requisitioned by the Administration or lost while under a requisition charter. These studies included, among other things, the following:
(1) A report of sales and appraisals of vessels and of the charter markets;
(2) an analysis of construction costs and operating profits of vessels, and
(3) a statement of underlying principles with respect to the “enchancement clause” contained in Section 902 (a) of the Merchant Marine Act of 1936.
After the studies were completed, the results thereof and the recommendations of the staff were presented to the *289 Administrator of the War Shipping Administration, who adopted the recommendations and thereafter issued General Order No. 37.
No hearings were held as a basis for the determinations of the rates or valuations set forth in the order, but there had been numerous discussions between representatives of the War Shipping Administration and shipowners at or prior to the time of the issuance of General Order No. 8, and the evidence shows that from time to time thereafter the representatives of the War Shipping Administration received information as to the views of shipowners.
The report to the Administrator stated that there were not sufficient sales to determine the market value of dry-cargo vessels built in the period 1914-1935 as of April 1942, when the general requisition of oceangoing freighters by the War Shipping Administration occurred. The elements of valuation and the proposed basis of valuation were set forth in the report as follows:

Per d. w. t.

A. Elements of valuation:
1. Construction cost — Depreciated to Apr. 1944 — Martin
scale-$64.67
2. Construction cost — Depreciated to Apr. 1944 — 33
yr. life_ 60.40
3. Average private sales (sound condition) Janu-
ary-February 1941- 70.00
4. Average sales from Government laidup fleet (sound
condition) January-February 1941_ 60. 00
6.Peak sales (sound condition) year 1941_ 88.00
6. Average Appraisals — March, April, May 1942 (no
sales)_ 76.00
7. Average appraisals — Tear 1943_ 70.00
8. Values under current charters_ 70. 00-75.00
9. Depreciation since date of general requisition (based
on $75.00 value):
(a) Two years at 10% annually_ 15.00
(b) Two years at 12%% annually- 18. 75
(c) Two years at 10% semiannually (on diminish-
ing balance)_ 25.79
B. Proposed basis of valuation:
1. Value at date of general requisition_ 75.00
2. Two years depreciation at 12%% of such value—
per annum_ 18.75
3. Proposed valuation as of April 20,1944_ 56.25
4. Proposed annual depreciation thereafter_ 9.37%
*290 The report of sales and appraisals which accompanied the memorandum submitted to the Administrator of the War Shipping Administration contained data covering 33 sales and 276 appraisals of dry-cargo vessels. Included in the appraisal data were 158 appraisals made by the Maritime Commission and 16 made by private appraisers in 1942, when there were no private sales. There were also three private appraisals in 1943. While the values arrived at by the private appraisers were about 10 percent higher than those of the Maritime Commission, the information submitted showed that values set by appraisers reached their peak sometime late in 1941 or early 1942 and that they declined thereafter. The average values assigned by the private appraisers in 1942 and 1943 declined from a high of $80.83 per deadweight ton in the early part of 1942 to a low of $69.96 per deadweight ton in the Spring of 1943.
The appraisal report pointed out that the valuations varied with the age, size, speed, horsepower, and equipment of the vessels. A table contained in the report showed that the average value of twenty-six vessels constructed between 1910 and 1913 was $47.89 per deadweight ton, whereas the average value for fifty-two vessels built between 1917 and 1918 was $67.60 per deadweight ton.' The figures submitted also demonstrated that the values varied in accordance with the deadweight tonnage of the vessels, the highest values being assigned to vessels of from 8,000 to 8,999 deadweight tons.
In the determination of the basic valuation, very little consideration was given to private sales of vessels in 1941, and no weight was accorded to the average price realized from the Government sale of laidup vessels in 1941.
The evidence does not disclose exactly how the basic valuation of $75 per deadweight ton as of April 1942 was arrived at. However, the determination that all dry-cargo freighters constructed between 1914 and 1935 had a basic valuation of $75 in April 1942, without regard to differences in age, condition, or equipment, is contrary to the supporting data submitted to the Administrator as a basis for his determination.
It was the judgment of the Administrator and his staff that the dry-cargo freighters constructed prior to 1935 were *291 a wasting economic asset as of April 1942; that such vessels had a useful economic life during an anticipated war and post-war period of eight years after April 1942, and that at the end of the eight-year period, these vessels would be obsolete and unable to compete commercially, having only a scrap value remaining. While that determination was necessarily based on judgment and opinion, there is no evidence that it was arrived at capriciously or in bad faith. As a result of the decision, a depreciation rate of 12% percent a year was adopted and the application of that rate reduced the $75 basic valuation of April 1942 to $56.25 as of April 20,1944.
In addition to the elements referred to above, the valuations provided for in General Order No. 37 were based in part on the fact that the entire merchant fleet of the United States had to be utilized in furtherance of the war effort and the freighters could not be operated during the war without Government assistance, including convoy protection and the assignment of priorities for obtaining fuel, repairs, and docking facilities.
38. In a memorandum submitted on April 15, 1944, to the House Committee on Merchant Marine and Facilities, the Administrator of the War Shipping Administration stated with respect to the schedule of valuations established by General Order No. 37 that:
(1) The values are about one-third of those provided for in World War I when the basic value was $165.
* * :¡c * *
(4) The values approximate the 1940 sales and insurance values for freighters. * * *
(5) The basic values will produce a loss in the case of certain purchases at high 1941 prices. * * *
(6) The basic value is below recent appraisals made for the purpose of making financial adjustments in marine casualties. The $56.25 scale of values established in General Order No. 37 represents a reduction of approximately 25 percent from previous levels. * * *
39. On December 21, 1941, the plaintiff and the Maritime Commission entered into a written time charter under which the Commission chartered plaintiff’s vessel, the Utahan, for *292 one round voyage from United States Atlantic ports to the ports in Africa, the Gulf of Aden, the Red Sea, the Mediterranean Sea, the Persian Gulf, the Gulf of Oman, and return via the same route or via the Straits Settlement, Dutch East Indies, the Philippine Islands at a monthly charter hire of $4.50 per deadweight ton on an agreed tonnage of 10,300 tons. The evidence does not indicate when this charter terminated, but the Utahan was under a requisition time charter to the Maritime Commission from April 1942, to September 5, 1943. From September 5, 1943, to April 11, 1946, the Utahan was in the possession of the War Shipping Administration under a requisition bareboat charter.
During the time the Utahan was under requisition, both on a time charter and a bareboat charter basis, plaintiff acted as general agent of the War Shipping Administration and kept accounts of vessel expenses such as crew wages, supplies, stores, etc. Another shipping line, acting as berth agent of the War Shipping Administration, kept accounts of the freight and cargo expenses. Plaintiff’s Exhibit 114-A consists of plaintiff’s compilation, from its records and from the records of the berth agent, of the results of three voyages of the Utahan between United States Gulf ports and the West Coast of South Africa. The revenues included in the compilation are based on the freight rates in effect when the voyages were made and do not include the charter hire or other compensation received by plaintiff as general agent. Voyage No. 9, the first of the three voyages, covered the period from July 7, 1943, to September 4, 1943, while the vessel was under a requisition time charter. Voyages Nos. 10 and 11, the second and third voyages included in the compilation, covered the period from September 5, 1943, to February 29,1944, while the vessel was under requisition on a bareboat charter basis. The earnings per deadweight ton per month of the Utahan, before depreciation and taxes, were $5.20 on the first voyage, $6.70 on the second voyage, and $3.59 on the third voyage. No evidence was submitted as to the earnings of the Utahan on voyages which the vessel may have made between April 1942 and June 7, 1943, nor between February 29,1944, and April 11,1946.
*293 The results of these three voyages made by the TJtahan are not sufficient to show the level of earnings realized in the operation of the requisitioned vessels. It was necessary for the War Shipping Administration to utilize the entire requisitioned merchant fleet as one pool of shipping to meet the Nation’s vast needs in the conduct of the war. The fleet was used for the carriage of military cargo, lend-lease goods, and commercial cargo.
Military cargo was accorded the highest priority among the several claimants for dry-cargo shipping space and no charge was made for the carriage of such cargo.
Shipping space for lend-lease cargoes was arranged by the War Shipping Administration in conjunction with the Lend-Lease Administration. The WSA was paid for the transportation of such cargoes on the basis of special rates fixed by the Lend-Lease Administrator and the governments of the recipient countries.
Outbound commercial cargoes, which were accorded the lowest priority for vessel space, were regulated by export licenses issued by the Board of Economic Warfare, which also issued shipping permits. The shipment of commercial cargoes from other countries to the United States was controlled by the War Production Board, with the assistance of the WSA. The priority ratings assigned to various commodities and the assignment of vessel space for their transportation was based upon the needs of the United States for the particular commodities. For outbound cargoes, shipping space was usually allotted in the order of the issuance of the export licenses and shipping permits, but consideration was given to the Nation’s needs for commodities available for export from the areas to which the outbound cargoes moved. Until near the end of the war, the number of freighters allotted for the movement of outbound commercial cargo was always less than five percent of the total merchant fleet. In some instances, the WSA collected charges for the transportation of commercial cargoes at the regular berth rates, plus surcharges, in effect at the time. In other instances, particularly for bulk cargoes, the WSA issued special rate orders fixing the rates to be charged for the specific shipments covered.
*294 The war needs were such that on a single voyage, a freighter might be engaged partly in carrying military goods and partly in transporting commercial cargo. There were triangular routes which did not exist under peacetime conditions, and circumstances arose which required that a particular freighter travel empty one way and return with a load of essential commodities.
Under the circumstances described, the WSA was unable to segregate the income received by it from the carriage of commercial cargoes distinct from that received from military or other war use, but the entire requisitioned fleet was operated at a substantial loss to the Government. No consideration was given by the WSA to the revenues it received from the use of the requisitioned ships in determining the amount of just compensation from such vessels.
40. As indicated in preceding findings, the values of large, dry-cargo freighters, such as the requisitioned vessels, were materially affected not only by the Ship Warrants Act and the regulations issued pursuant thereto but also by conditions which arose out of the Nation’s participation in the war. The delays involved in convoy movements and other delays caused by war conditions have been described in Finding 15. Convoy protection was essential in nearly all trades and an American-flag freighter carrying commercial cargoes could not operate on the seas without convoy protection during the war.
The extent to which the ocean-borne transportation of both inbound and outbound commercial cargoes was controlled by regulations issued by agencies other than the War Shipping Administration has been set out in Finding 39.
Fuel required in the operation of vessels and materials and supplies needed to keep them in repair were frequently in short supply during the war and it was necessary to allocate the use of such materials under a priority system as in the case of other materials and supplies of which there was a wartime shortage.
The combined effect of the legislative and administrative restrictions and of the conditions created by the war was to reduce the values and the earnings of the requisitioned vessels and other freighters below the levels which existed in *295 1941. Although the greater portion of such reduction was caused by the regulations of the War Shipping Administration, neither the exact amount of the reduction resulting from those regulations nor that due to the other causes referred to above, can be ascertained from the record.
If plaintiff’s vessels had not been requisitioned, the conditions and restrictions which existed during the war were such that it would not have been possible for plaintiff to operate the vessels in the trades and for carriage of the kinds of cargo which produced the high level of earnings and resulted in the values that prevailed in 1941.
41. If plaintiff’s eight vessels, which were requisitioned in the period from December 2,1942, to January 8,1945, had been constructed in a private shipyard on the respective dates when they were requisitioned, the reproduction cost, including labor, materials, overhead, technical services, and all other incidental expenses of each vessel per deadweight ton would have been the amount shown in the table below. Based on such reproduction cost, depreciated at the rate of five percent per annum on annually diminishing balances for the interval of time between the date when the vessel was actually constructed and the date when it was taken, the depreciated reproduction cost of each vessel as of the date when it was taken is also shown in the table below.
Name of vessel Reprod. cost new 4-Cost depreciated Nebraskan_ JDakolan_ Iowan_ Nevadan — _ Pennsylvanian.. IMnolan — _ Kentuckian_ Columbian. Per d. w. t. $268 279 278 295 290 241 293 297 $56.12 59.89 64.40 61.81 59.12 64.48 51.21 58.89
42. The following is a summary of the evidence as to the actual use made by plaintiff, prior to the respective dates of requisition, of the eight vessels that were taken in the 1942-1945 period and of the evidence as to the earnings or profits derived by plaintiff from such use:
(a) Nebraskan. — On February 26, 1940, this vessel was chartered to the Isthmian Steamship Company for a period *296 of three months for a voyage from the Atlantic Coast to Hawaii via the Pacific Coast and return to the Atlantic Coast at a charter hire of $44,000 per calendar month. There is no evidence as to plaintiff’s costs or earnings under this charter. Although the evidence does not specifically show what use was made of the vessel from the date the voyage ended to February 9,1942, it was apparently engaged in the domestic intercoastal service.
On February 9, 1942, the War Shipping Administration requisitioned the use of the vessel under a time charter providing for a basic charter rate of $8.76 per deadweight ton per. month, in accordance with War Shipping Administration General Order No. 8, which specified that vessels with a speed in excess of 10y2 knots should receive an additional sum of ten cents per deadweight ton per month for each knot or measured fraction thereof over 10y2 knots. The charter also provided for a war risk valuation on the vessel, pursuant to WSA General Order No. 9, of $65 per deadweight ton with a speed bonus at the rate of $5.00 per deadweight ton for each knot or major fraction thereof over 8y2 knots. The charter stated that the speed of the Nebraskan was about 12.5 knots. Plaintiff executed the requisition time charter and therein agreed to accept the monthly charter hire of $3.75 per deadweight ton, together with the adjustments allowed by General Order No. 8. However, plaintiff refused the war risk insurance valuation and accepted an optional provision in the charter, whereby plaintiff agreed to accept just compensation to be determined in accordance with Section 902 of the Merchant Marine Act of 1936 for any loss or' damage due to a risk imposed upon the defendant by the terms of the charter. There is no evidence as to the amount of the cost paid by plaintiff as a result of operations under this charter or of the net return to plaintiff therefrom.
(b) Dakotan. — There is no evidence as to the use or earnings of this vessel prior to February 20,1942, except that it was engaged in the intercoastal service until January 21, 1942, when the Maritime Commission directed discontinuance of that service.
On February 20, 1942, the use of the vessel was requisitioned under a time charter providing for the same basic *297 monthly charter hire and the same war risk insurance valuation as the requisition time charter described in (a) above. Plaintiff executed the charter on the same terms and conditions as contained in the requisition time charter covering the NebrasJcan. The charter stated that the speed of the vessel was about 12.25 knots. There is no evidence as to the amount of the costs paid by plaintiff in operating under the charter, or of the net return to the plaintiff thereunder.
(c) Iowan. — This vessel was apparently engaged in the intercoastal domestic service until November 28, 1941, when plaintiff chartered it to the Maritime Commission on a trip basis for one round trip voyage from the Pacific Coast to the Philippines and return to the Atlantic Coast at a monthly charter hire of $4.50 per deadweight ton on an agreed deadweight capacity of 10,175 tons, and an insurance valuation of $1,017,500. The evidence does not show the amount of plaintiff’s costs or earnings under this charter.
On February 6, 1942, the use of this vessel was requisitioned under a time charter providing for the same basic monthly charter hire and the same war risk insurance provisions as the requisition time charter described in (a) above, and plaintiff executed the time charter on the same terms as set forth in the time charter covering the Nebraskcm. The charter stated that the speed of the Iowan was 12.25 knots. There is no evidence as to plaintiff’s costs or net return under this charter.
(d) Nevadan. — The only evidence regarding the use or earnings of this vessel prior to March 17, 1942, shows that it was engaged in the intercoastal domestic service until January 21, 1942, when the Maritime Commission directed the discontinuance of that service.
On March 17, 1942, the WSA requisitioned the use of the vessel under a time charter, providing for the same basic monthly charter hire and the same war risk insurance valuation as the requisition time charter described in (a) above. Plaintiff executed the charter on the same terms as those contained in the charter covering the Nebraskan. The charter stated that the speed of the Nevadan was about 11.3 knots. There is no evidence as to the amount of plaintiff’s costs or earnings under this charter.
*298 (e) Pennsylvanian. — This vessel was apparently engaged in the domestic intercoastal service until July 21, 1941, when it was chartered to the Maritime Commission, acting for the British Ministry of War Transport, for one trip to the Red Sea at a charter rate of 75 cents per cubic foot on an agreed bale cubic capacity of 491,084 cubic feet plus 60 cents per cubic foot for cargo carried on deck. The vessel operated on a berth basis homeward and the entire voyage lasted from September 4, 1941 to February 1, 1942. Plaintiff’s earnings on the voyage before overhead, depreciation, and Federal taxes, amounted to $5.39 per deadweight ton per month.
On February 2,1942, the use of the vessel was requisitioned under a time charter, containing the same provisions as have been described in (a) above, and entered into by plaintiff on the same basis as the requisition time charter covering the Nebrashan. The charter specified that the speed of the vessel was about 12.25 knots. There is no evidence as to plaintiff’s costs or earnings under this charter.
On July 13,1943, the use of the Penmylvcmian was requisitioned on a bareboat basis, under which the WSA tendered to plaintiff a charter providing for a monthly charter hire of $13,329.25. The charter also provided for a war risk valuation of $572,343.75, which was to be reduced each subsequent 12-month period thereafter by $8.54 per deadweight ton. The charter was rejected by plaintiff.
(f) Illmoian. — On May 3, 1940, this vessel was time chartered to the Isthmian Steamship Company for one round trip between the United States and the Straits Settlement and/or India. The charter provided for a rate of $5.00 per deadweight ton per month and a war risk insurance valuation of $534,750. On November 8, 1940, this charter was extended to cover a second voyage at a charter rate of $4 per deadweight ton per month and with a war risk insurance valuation of $562,250. On June 10, 1941, the charter was again extended to cover a third trip under a charter rate of $7 per deadweight ton per month and with a war risk valuation of $1,069,500. There is no evidence as to plaintiff’s costs or net profits on the first two voyages, but on the third voyage ending December 10, 1941, plaintiff’s profit, *299 before overhead, depreciation, and Federal taxes, amounted to $5.17 per deadweight ton per month.
On December 18, 1941, plaintiff chartered this vessel to the Maritime Commission on a trip basis for one round voyage from the Atlantic Coast to India or Burma and return, at a monthly charter hire of $4.50 on an agreed deadweight capacity of 10,700 tons and a war risk insurance valuation of $1,070,000. There is no evidence as to plaintiff’s costs or net return under this charter.
On June 12, 1942, the WSA requisitioned the use of this vessel on a time charter basis. Plaintiff agreed to accept a basic monthly charter hire of $4 per deadweight ton per month with the adjustments provided for in General Order No. 8. Plaintiff refused to accept a war insurance valuation computed pursuant to General Order No. 9 and, in lieu thereof, agreed to accept just compensation to be determined in accordance with Section 902 of the Merchant Marine Act for any loss or damage due to a risk assumed by the defendant under the terms of the charter.
On July 27, 1943, the WSA requisitioned the use of this vessel on a bareboat basis, whereby it tendered to plaintiff a charter providing for hire at a monthly rate of $13,525 and war risk insurance in the amount of $680,625, which was to be reduced each subsequent 12-month period by $9,375 per deadweight ton. Plaintiff refused to accept the charter.
(g) Kentuckian. — On January 31, 1940, this vessel was chartered to the Isthmian Steamship Company for a round trip to India via the Gulf of Mexico at a monthly charter rate of $3.50 per deadweight ton. A war risk insurance valuation of $325,000 was established as of February 29, 1940, and this was increased to $496,250 on April 19, 1940. On July 3,1940, the Kentuckian was chartered to the American South African Line, Inc. for one round trip (estimated to consume 3y2 months) at a monthly charter rate of $3.75 per deadweight ton and with a war risk insurance valuation of $496,250. There is no evidence as to plaintiff’s costs or net returns on either of these voyages.
On June 20, 1941, the vessel was chartered to Isthmian Steamship Company on a time basis for a round trip to Brazil (estimated to consume four or five months) at a *300 monthly time charter rate of $7 per deadweight ton and with a war risk insurance valuation of $992,500. On this voyage, plaintiff’s earnings, before overhead, depreciation and Federal taxes amounted to $5.23 per deadweight ton per month.
Plaintiff operated the Kentuckian on a berth basis on a voyage to South America beginning October 30, 1941, and ending April 14, 1942. On this voyage, plaintiff’s earnings before overhead, depreciation and Federal taxes amounted to $2.84 per deadweight ton per month.
On April 15, 1942, the WSA requisitioned the use of the vessel under a time charter. Plaintiff agreed to accept a monthly basic rate of $3.90 per deadweight ton per month, with the adjustments provided in General Order No. 8, and it further agreed to accept just compensation in accordance with Section 902 of the Merchant Marine Act of 1936 for any. loss or damage due to a risk assumed by the defendant under the terms of the charter. The charter provided that the speed of the vessel was about 12.1 knots. There is no evidence as to plaintiff’s costs or net returns under this charter.
On July 26, 1943, the WSA requisitioned the use of the vessel on a bareboat basis, whereby it offered to pay plaintiff a monthly charter hire of $12,406.25 and to provide war risk insurance of $459,031.25, which was to be reduced each subsequent 12 months by $7.71 per deadweight ton. Plaintiff rejected the charter.
(h) Cól/ambiam,. — On June 6, 1941, plaintiff executed a space charter of this vessel to the Maritime Commission, acting on behalf of the British Ministry of War Transport, for one voyage to the Red Sea at a rate of 75 cents per cubic foot on a bale capacity of 470,231 cubic feet, plus 60 cents per cubic foot for any cargo carried on deck. The charter was predicated upon obtaining war risk insurance on a valuation of $950,000. The vessel operated on a berth basis homeward, the voyage beginning on June 6, 1941, and ending on October 16, 1941. Plaintiff’s earnings, before depreciation, overhead, and Federal taxes, on the voyage were at the rate of $6.58 per deadweight ton per month.
On October 17,1941, plaintiff executed with the Maritime Commission a timé charter for the vessel, covering one round trip voyage from the Atlantic Coast to African ports and *301 return at a monthly charter hire of $4.60 per deadweight ton. The charter provided a valuation for insurance purposes of $950,000. There is no evidence as to plaintiff’s costs or net returns on this voyage.
On April 7,1942, the Gobwmbiam, was requisitioned by the WSA on a time charter basis under which plaintiff agreed to accept a basic rate of $3.90 per deadweight ton per month, plus the adjustments provided for in General Order No. 8. The agreed speed of the vessel was about 12.1 knots. Under the terms of the charter, plaintiff agreed to accept just compensation in accordance with Section 902 of the Merchant Marine Act of 1936 in the event of loss or damage due to a risk imposed upon defendant by the terms of the charter. The evidence does not show plaintiff’s costs or net return under this charter.
On July 12, 1943, the WSA requisitioned the use of the vessel on a bareboat basis, whereby it tendered to plaintiff a monthly charter hire of $18,147.20. The charter provided for a war risk insurance valuation of $570,715, to be reduced each subsequent 12-month period by $8.54 per deadweight ton. Plaintiff refused to accept the charter.
43. Until the latter part of 1944 or early part of 1945, it was not possible to make reasonably accurate forecasts as to the postwar prospects of the requisitioned ships. However, it was known that after World War I there was an abnormal world demand for shipping space for a period of slightly less than two years after which there was a severe decline in domestic ship values. In view of the greater scope of World War II, the loss of so many foreign merchant vessels in the war, and the destruction of shipyards abroad, it could reasonably be anticipated that a longer period of time would be required than after World War I for new construction in foreign yards to replace the losses sustained in the war. It could also be reasonably anticipated after the middle of 1943, when each new ship constructed constituted a net addition to the fleet, that the United States would emerge from the war with a considerably greater tonnage of dry-cargo freighters than it had when the war began.
On January 1,1945, the Director of War Mobilization and Reconversion submitted to the President and Congress a *302 report stating that, whereas there were 1,100 seagoing vessels in active service under the American flag in 1939, the fleet at the end of the war would exceed 5,700 vessels, including 2,500 Liberty ships, 700 old prewar vessels to be retired in due course, and 2,500 efficient C-type and Victory dry-cargo ships and tankers. Concerning immediate postwar problems and needs, the report stated in part as follows:
The Maritime Commission’s Post-war Planning Committee is now developing policies and procedures. Legislation is pending to govern the sale of war-built ships. Discussions are being carried on with American shipping companies to determine their post-war intentions.
* # # $ #
In the meantime, the merchant fleet’s wartime responsibilities will not cease with victory. Large numbers of troops presumably still will be overseas — in Europe and the Far East — as part of the armies of occupation. They will have to be supplied. And if a rotation of occupation armies is adopted, the transport fleet, largely converted from cargo ships, will be required to carry troops to and from Europe and the Far East. War employment of the merchant marine thus will continue for some time after the last guns are fired.
On May 7, 1945, hearings were held by the Senate Committee on Commerce on a bill to provide for the sale by the Government of surplus war-built vessels. During the hearings, the Administrator of the War Shipping Administration stated that at the end of the war most of the Liberty ships would be surplus to the commercial needs of our merchant marine, but that it was impossible to tell at that time whether there would be a surplus of the new C-type and Victory ships. On the same occasion, he said that there would be a demand for the use of all ships under the American flag for a period of from 6 to 24 months after the end of the war.
In June 1945, the Graduate School of Business Administration of Harvard University submitted to the Navy and the Maritime Commission a report which is in evidence as Plaintiff’s Exhibit 211 and is entitled “The Use and Disposition of Ships and Shipyards at the End of World War II.” The following is a summary of pertinent sections of the report:
(a) Tonnage of United States-flag vessels at the end of *303 the war. — By the end of 1945, the United States will have 5,500 vessels, aggregating 40,000,000 gross tons in the salt water fleet. This tonnage will be approximately five times the pre-war tonnage and about 61 percent of the total world tonnage. Included among the 5,500 vessels will be 4,200 dry cargo ships, including 2,375 Liberty ships, 1,000 major C-type and Victory ships, 225 coastal type vessels, 50 vessels under construction and 550 old cargo vessels.
(b) Quality of the postwar fleet. — Excluding tankers, there were only 31 vessels in the United States foreign trade fleet in 1939, which were less than 10 years old, but by the end of 1945 the United States will have 4,000 vessels less than five years old. In 1938, there were less than 15 United States-flag cargo vessels with a speed of 14 knots or over, whereas in 1945 there will be 1,000 cargo ships with speeds of 14 knots or over and at least 300 with speeds over 16 knots.
(c) Probable composition of the postwar fleet. — The postwar fleet will consist for the most part of modern C-type ships and a number of Victory ships, all having an average speed of at least 15.5 knots and an average gross tonnage of 7,500. Because of the increased speed and size of the new vessels, 840 of the new ships, rather than 1,260 of the older ships, can carry the probable minimum postwar foreign trade of the United States, while 1,160 new ships rather than 1,750 of the old ships can carry the probable postwar maximum trade of this country. Since it is reasonable to expect that United States-flag ships will carry an average of not more than 40 percent of the total United States foreign trade after the war, the freight-carrying fleet under the United States flag will approximate 325 dry-cargo and 75 combination ships, aggregating 3,000,000 gross tons, as compared with an active foreign-trade fleet in 1939 of 271 ships, totaling 1,750,000 gross tons.
(d) The postwar demand for old, dry-cargo vessels. — In the postwar period, there will be little demand by United States ship operators for the old, dry-cargo vessels that composed part of the active dry-cargo fleet in 1938. 208 of these vessels will be 23 years old or more in 1945; they are generally obsolete and will not be able to compete with the modem types.
*304 (e) Foreign demand for old, dry-oargo freighters (15 years old or older). — Begarding the probable demand by foreigners for the older vessels, the report stated:
Some of the older ships that the Government will possess at the end of the war will be quite useful. Many foreign operators will wish to obtain ships that can be used for a few years until new ships can be purchased. Likewise, United States firms, particularly coastwise and intercoastal operators, that need specialized types not available among the Government-owned ships would be willing to use these older ships temporarily. These ships may in a sense be obsolete, but they can provide transportation during; such a temporary emergency. Their value will arise solely from such temporary demands and will have little, if any, relation to their cost, either original or reproduction, less depreciation. This will be particularly true for those ships over 20 years old, which would theoretically be valueless.
Since a formula of cost less depreciation will not produce even approximately correct prices for these older ships, their prices ought to be related to value. There will be many types of ships included so that any blanket price would be impractical, and it is suggested that the price for each individual ship be established by appraisal of its probable value in temporary service. A minimum should be provided, however, to avoid undue pressure on all ship values. The authors suggest that no price should be less than 20 percent of the postwar foreign reproduction cost of a similar ship.
44. The defendant does not claim that the requisitioned vessels were enhanced by the Government’s activities in the particular market for the purchase and sale of large, dry-cargo freighters, or by the previous or prospective taking of similar vessels. However, with respect to plaintiff’s eight ships, which were requisitioned in the 1942-1945 period, the defendant contends that 44 percent of the increase in the value of plaintiff’s ships from September 1, 1939, to the end of April 1941 was the result of the Government’s need for dry-cargo, ocean transportation during that period for: (1) Army and Navy exports to overseas bases in Hawaii, the Philippines, the Panama Canal, and to bases in the Atlantic and the Caribbean obtained from the United Kingdom, and (2) for imports of the Government’s stockpiles of strategic *305 and critical commodities required in the national defense program.
45. The quantity of exports from this country carried on United States-flag vessels increased from 5,839,000 tons in 1939 to 8,414,000 tons in 1941, an increase of 2,575,000 tons. However, one-half of these increased carryings by United States-flag freighters occurred in 1940, and none of the additional carryings in that year were attributable to defense shipments for the Army and Navy to the bases referred to above.
On March 10, 1941, the Secretary of War transmitted to the Maritime Commission an official estimate dated February 25,1941, indicating that the War Department had a need in excess of the transports available to it, for oceangoing freighters for the transportation of cargo from the United States to our military bases in Panama, Hawaii, the Philippines, and to other bases in the Atlantic and Caribbean which had been obtained from the United Kingdom in exchange for fifty United States destroyers transferred in the Fall of 1940. According to the estimate, 889,070 tons of cargo were to be transported to the military bases by July 1,1941, and an additional 2,555,059 tons of cargo were to be transported to the same locations in the fiscal year, beginning July 1,1941.
Of the trade routes on which the overseas bases were located, only the Atlantic-Canada-Newf oundland route and the Caribbean route showed an increase in exports from the United States in 1941 over those in 1940 — 746,000 more tons of cargo were shipped to these areas in 1941 than in 1940 and United States-flag vessels carried 722,000 tons of the additional tonnage. However, between 1940 and 1941, which was the period in which the Atlantic bases were acquired, there was an actual decline in the total tonnage moved by both United States-flag freighters and foreign-flag vessels to that particular area. The Caribbean route, on which the increased shipments from the United States moved, includes countries such as Cuba, Venezuela, Colombia, and Haiti, which are of great importance to the foreign trade of the United States. None of the bases were located in these countries, and there were substantial increases in exports to sev *306 eral of them, particularly to Cuba, between 1940 and 1941. Furthermore, the records of the dry-cargo vessel clearances for the British possessions in the Atlantic and the Caribbean, where the bases obtained from the United Kingdom were located, show that the tonnage employed in outbound trade to these British possessions increased only one percent between 1940 and 1941 and that United States-flag tonnage engaged in these trade routes actually declined between 1940 and 1941.
The evidence indicates that the estimate which the Secretary of War submitted to the Maritime Commission on March 10, 1941, was excessive, because on July 17, 1941, a member of the Maritime Commission, in his testimony before a Committee of the House, stated that the Army’s estimate of the quantity of cargo to be moved to the overseas bases in excess of the cargo to be shipped by the Army Transport Service during the fiscal year 1942 was 1,634,000 tons of cargo, whereas the Army estimate of March 10,1941, was for 2,555,059 tons of cargo.
When the Army submitted its estimate of March 10,1941, it stated that thirty-two 10,000-ton freighters would be needed to move the additional cargo to be shipped by July 1, 1941, and that twenty-six more vessels would be needed in the fiscal year 1942. Between September 1, 1939, and the end of April 1941, the Maritime Commission transferred to the Army and Navy fifty vessels, including twenty-four combination cargo and passenger ships and twenty-two freighters. The transfer of these vessels to the Army and Navy apparently satisfied part of the military needs for additional freighters as estimated on February 25,1941. If there was any enhancement in the value of plaintiff’s vessels during the period of time in issue because of military needs for shipping space to the overseas bases, the amount of such enhancement was negligible.
46. By the Act of June 25,1940 (54 Stat. 572) the Becon-struction Finance Corporation was authorized to create subsidiary corporations to acquire stockpiles of strategic and critical commodities for the national defense program. The importation of materials for the stockpile began in July 1940 and continued throughout 1941. The total stockpile imports *307 for 1940 amounted to 87,360 tons, which was equivalent to about one-tenth of one percent of the foreign and domestic trade of the United States during that year.
As shown in Finding 22, the peak in prices of large, United States-flag freighters was reached in April 1941 and the total stockpile purchases in the first quarter of 1941 were 233,097 long tons. This was a substantial increase over the purchases of 1940. However, if it is assumed that one-fourth of the 1941 foreign and domestic ocean-borne traffic of the United States moved in the first quarter of that year, the volume of the stockpile imports in the first quarter of 1941 represented about one percent of the total traffic. The total receipts under the stockpile program for the first half of 1941 amounted to 507,693 long tons or something less than two percent of the total foreign and domestic trade of the United States during the first sis months of 1941.
Although 1,125,876 long tons were acquired under the stockpile program in the third and fourth quarters of 1941, the shipments occurred after the peak in large freighter prices had been reached and after the Government had set in motion the activities, hereinbefore described, which had been the effect of depressing ship earnings and values.
Prior to June 23,1941, the seller was obligated to provide shipping space but thereafter the Beconstruction Finance Corporation and the Maritime Commission intervened in the shipping market to arrange space for the stockpile commodities. The evidence does not show how the stockpile commodities moved. Some were transported on foreign-flag freighters and some may have moved on military vessels. There is no evidence as to the quantity of these imports that moved on United States-flag freighters as a result of the intervention of the Government.
The effect of the stockpile program on the earnings and values of large freighters up to the time when the peak in value had passed was slight. Although the evidence does not afford any basis for approximating the amount of any enhancement that resulted from the Government’s need for shipping space for the importation of stockpile materials, the evidence is sufficient to show that the amount of the enhancement was very small and that it was a minor factor among *308 tlie many causes that contributed to the increased values of dry-cargo freighters from September 1,1939 to May 1,1941.
47. Any enhancement in the value of the requisitioned ships during the period from September 1, 1939 to the end of April 1941 that was caused by the Government’s need for shipping space and its intervention in the market for such space was more than offset by the reduction in earnings and values that was accomplished by the Maritime Commission in its administration of the Ship Warrants Act.
48. From a consideration of all the pertinent evidence (including such evidence covering the time prior to and after April 1942) of the factors affecting the values of the eight vessels requisitioned before 1946, it is found that at the time of the takings, the values that probably would have resulted from fair negotiations between willing buyers and willing sellers are the amounts set forth below and that such values do not include any enhancement due to the causes necessitating the taking:
Name of vessel: Value at time of tailing
Nebraskan — $894,727
Dalcotcm_ __ 761,191
Iowan_ __ 778,082
Nevadan_ _ 735,859
. Value at time Name of vessel. o/ taking
Pennsylvanian_$613,145
Kentudldan_ 577,635
IlUnoian_ 663, 266
Columbian_ 465, 000
49.On March 8, 1946, the Merchant Ship Sales Act of 1946 (60 Stat. 41) was enacted. That statute authorized the Maritime Commission to dispose of war-built merchant vessels to citizens of the United States at a “statutory sales price” which, in the case of dry-cargo vessels, was 50 percent of the prewar domestic cost. The Act also provided that the statutory sales price was to be depreciated at the rate of five percent per annum from the date of construction of the vessel and permitted the Maritime Commission to make a further deduction of three percent per annum for excessive wear and tear by reason of war service. Floor prices equivalent to 31% percent of the domestic war cost of the Liberty-type vessels and to 35 percent of the domestic war cost of other dry-cargo vessels were established. In addition, the Act provided that citizens of the United States could buy these war-built vessels at the established prices by making a down payment of 25 percent thereof and paying the balance *309 in twenty annual installments, bearing interest at the rate of 3y2 percent per annum.
On April 13, 1946, the Maritime Commission issued its General Order No. 60 promulgating rules and regulations for sales under the Merchant Ship Sales Act of 1946. For the standard Liberty cargo vessel, a ship of 10,800 tons deadweight capacity and a speed of 11 knots, the floor price set forth in the order was equivalent to $50.42 per deadweight ton. For the standard Victory cargo vessel, which was a modern vessel of 10,800 deadweight capacity and a speed of 15.3 knots, the floor price established in the order was equivalent to about $81.40 per deadweight ton.
As a result of the passage of the Merchant Ship Sales Act of 1946, there was virtually no demand by American ship operators for old, dry-cargo vessels, such as the Mexican and the Virginian, when they were requisitioned in May 1946. However, in May 1946, there was a market in the United States for the sale of privately owned old, dry-cargo, American freighters to foreign buyers. Defendant’s Exhibit 63, sets forth pertinent information covering the sale of twenty-four old, dry-cargo freighters to foreign buyers during the period from April through December 1946. Included among the sales to foreign buyers were thirteen freighters of over 10,000 tons deadweight capacity and varying in age from 25 years to almost 43 years at the time of the sales. The sales prices ranged from $240,000 to $445,000 per ship. There were also eleven sales of dry-cargo freighters of more than 9,000 tons deadweight capacity and varying in age from about 25 years to more than 29 years on the dates of sale. The sales prices ranged from $150,000 to $400,000 per ship.
When they were requisitioned, the Mexican was more than 39 years old and the Virginian was nearly 43 years old. Among the sales to foreign buyers, the vessel, which was nearest in age and size to the Mexican and Virginian, was the President Johnson, a vessel of 15,167 tons deadweight capacity, which was more than 42 years old at the time of sale. This vessel had originally been a combination passenger-cargo ship, but had been converted to a dry-cargo freighter. She was sold in December 1946 at a price of $240,000.
*310 Among tbe sales in 1946, there was also the William Luokenbaok, which was comparable in age to the Mexican and Virginian. She was a dry-cargo freighter of 10,901 tons deadweight capacity and was more than 33 years of age when sold in December 1946. She was sold for a price of $445,000.
In 1946, plaintiff sold five of its dry-cargo freighters to foreign buyers. The Utahan was sold in May 1946 at a price of $320,000; the Kansan was sold in August 1946 at a price of $350,000; the GaroUniam, was sold in August 1946 at a price of $380,000; the Arizonian was sold in October 1946 at a price of $385,000, and the Georgian was sold in November 1946 at a price of $360,000.
The prices paid by the foreign buyers in 1946 represented prices for the vessels in their condition at the time of sale without regard to any expenditures required to place them in sound operating condition.
50. On the basis of the sales of the privately owned American freighters, referred to above, at or about the time the Mexican and Virginian were requisitioned, it is found that the fair market value of these vessels at the time they were taken was as follows:
Mexican_ $320, 000
Virginian_ 300,000
51. The issue of enhancement is not involved in the suits for just compensation for the taking of the Mexican and the Virginian.
52. In each of the ten suits consolidated in these proceedings, the plaintiff is entitled to recover from the United States, as just compensation for the requisition for title of the vessels which are the subject of the suits, the amounts set forth in findings 48 and 50, less the amounts paid by the defendant on account as set forth in findings 4 and 5, which results in the amounts set forth below:
Nebraskan_ $336, 401.5G
Dalcotan_ 258,533.50
Iowan_ 257,024.75
Nevadan_ 279,184. 75
Pennsylvanian 188,712. 50
Eentuclcian_ 253, 603.50
IlUnoian_ 221,702. 00
*311 OoVambian_ 349, 614.17
Meceioan_ 184,377.05
Virginian_ 181,424. 07
Total_$2, 510,577.79
Plaintiff is further entitled to recover in each suit as just compensation for delay in payment interest at the rate of 4 percent per annum computed as follows:
(a) Interest on the full principal amount of just compensation as set forth in findings 48 and 50 from the date of requisition to the date when plaintiff received defendant’s payment on account which is set forth in findings 4 and 5; and
(b) Interest on the difference between such full amount and such payment on account as set forth, above in this finding from the date of the payment on account to the date of payment of the judgment.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is entitled to recover.
The entry of judgment is suspended to await the filing of a stipulation by the parties showing the amount due plaintiff, computed in accordance with this opinion.
In this case, on a stipulation by the parties, an order was entered on October 4,1955, rendering judgments, as follows:
Now, THEREFORE, it is ordered this fourth day of October 1955, that judgments be and the same hereby are entered for plaintiff in the above-numbered cases in the following amounts:

O ase No. J¡87W:

Four hundred fifty-nine thousand three hundred sixteen dollars and six cents ($459,316.06), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date Until date of payment to be computed at the rate of $30.5956 per day;

*312
Case No. 48935:

Five hundred fifty-eight thousand six hundred seventy-eight dollars and sixty-eight cents ($558,678.68), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $36.8659 per day;

Case No. 48936:

Four hundred thirty-five thousand four hundred fifty-eight dollars and seventy-three cents. ($435,458.73), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $28.3324 per day;

Case No. 48940:

Four hundred thirty-three thousand seven hundred eleven dollars and ten cents ($433,711.10), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12,1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $28.1671 per day;
Case No. 40126 (Second cause of action) :
Two hundred eighty-five thousand two hundred fifty dollars and forty-one cents ($285,250.41), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12,1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $20.6808 per day ;
CaseN0.49136 (Second cause of action) :
Three hundred thirty-three thousand three hundred thirty-three dollars and seventy-one cents ($333,333.71), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $24.2961 per day;
*313 Case No. lfillj.1 (Second cause of action):
Three hundred seventy-five thousand six hundred forty-two dollars and ninety-six cents ($375,642.96), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $27.7922 per day;

Case No. Jfi990:

Five hundred fifteen thousand one hundred thirty-six dollars and two cents ($515,136.02), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12,1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $38.3139 per day;

Case No. J$-5%:

Two hundred sixty thousand three hundred thirty-five dollars and sixty-six cents ($260,335.66), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12,1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $19.8821 per day;

Case No. 1¡3~5%:

Two hundred sixty-six thousand four hundred ninety-five dollars and fifty-eight cents ($266,495.58), which sum is comprised of both the principal amount and interest, not as interest but as part of just compensation, due plaintiff as of July 12, 1955, together with further interest as part of just compensation from that date until date of payment to be computed at the rate of $20.2057 per day; and
It is FURTHER ORDERED that further proceedings relative to the first causes of action in Cases Nos., 49126,. 49136 and 49141 are suspended pending either the' filing of a stipulation by the parties or the filing of a report by a Commissioner of this court.

Plaintiff's petition for writ of certiorari denied October 17, 1955.